## Case No. 3,591.

### DAVEY v. The MARY FROST.

[3 Cent. Law J. 419;[1] 22 Int. Rev. Rec. 82.]

District Court, E. D. Texas. 1876.[2]

SALVAGE SERVICES BY CITY FIREMEN.

Firemen employed and paid under a city ordinance are not entitled to salvage for vessels saved while lying at their wharves, as their services are simply in the line of their duty.

MORRILL, District Judge. The libel charges, among a great many other things, that the vessel, on the night of the 11th of January, 1876, was fastened at one of the wharves of Galveston, receiving her cargo, there being then on board 800 bales of cotton, when an alarm of fire was sounded throughout the city and the port of Galveston; whereupon libellants went immediately to the vessel, and finding a portion of the ship's lading on fire, with six steam fire engines, and firemen working under the control, direction, and superintendence of libellants, promptly proceeded to extinguish the fire, and in about four hours the cargo and that portion of the ship on fire were completely submerged and the fire extinguished. It is further alleged that the "night was cold and the weather inclement; that by reason of exposure and loss of sleep the libellants were worn out with fatigue." That in order to extinguish the fire it was necessary to submerge the cargo, and also, in order to recover the ship and cargo from the submersion, it was necessary to take out from the ship the water that had been thus put in; and that libellants did this the next day. The master of the ship admits the extinguishing of the fire, and the necessity of it; but denies that there was any necessity for libellants' labor in pumping out the ship, and that they did not, and could not, completely do so. The master further insists that the libellants are not entitled to salvage, because they were the firemen of the city, and as such did no more than their duty. It seems that one of the libellants was the chief engineer of the fire department, and receives a salary as such; that the other libellant was foreman of one of the companies; and that those employed to keep the horses, are constantly on the watch, so as to take the engines to fires upon hearing the alarm bells, and also that the engineers in charge of the engines, have salaries from the city as such employees; and that the libellants, as well as most of the others engaged, were dressed in firemen's uniform. There was much more testimony, some of which will be referred to. In fact, two entire days were consumed in hearing the evidence. The libellants introduced witnesses to prove that the ship was abandoned and derelict. But in what manner a ship fastened to the wharf of a city, and receiving her cargo, even if her

[1] [Reprinted from 3 Cent. Law J. 419. by permission.]

[2] [Affirmed in Case No. 3,592.]

officers and crew should be absent from her, can be said to be derelict, it is difficult to understand, unless we mean by the word what is meant if a storehouse or bank should be found in a similar condition.

The first point raised by the pleading denies the ability of libellants to maintain this suit. It is and must be admitted by all parties that this court cannot entertain jurisdiction unless it is a case of salvage, which is the first question for consideration. " 'Salvage' means the compensation which is earned by persons who voluntarily assist in saving a ship or cargo from peril." 1 Pars. Mar. Law, art. 595. "Salvage in admiralty, and generally in the law merchant, is the compensation earned by persons who voluntarily assist in saving a ship or cargo from a maritime peril." Appl. Enc. "The relief of property from an impending peril of the sea by the voluntary exertions of those who are under no legal obligations to render assistance, and the consequent ultimate safety of the property, constitutes a technical case of salvage." 1 Curt. 355 [Hennessey v. The Versailles, Case No. 6,365]. "This definition quoted and adopted in" 1 Cliff. 216 [Adams v. The Island City, Case No. 55]. "The salvage services must be performed by persons not bound by their legal duty to render them." 2 Pars. Mar. Law, 599. "Courts of admiralty will not permit the performance of a public duty to be turned into a traffic or profit." [Post v. Jones] 19 How. [60 U. S.] 160. The foregoing quotations taken from authorities that we are bound to respect, though somewhat different in verbiage, yet concur in one point. Hence a person engaged on board a ship, whether as common seaman, pilot, mate or captain, or in any other capacity, cannot receive salvage, because whatever each and all may do in saving a ship, it is simply doing their duty. Not only so, but "in all cases of wreck or loss of vessel, proof that any seaman did not exert himself to the utmost to save the vessel, cargo and stores, would bar his claim to wages." Rev. St. § 4525; 1 Pars. Mar. Law, 599. But it is not only to the officers and crew of a ship in peril that these remarks are applicable, but all others whose duty, whether of a public or private nature, requires their action. Accordingly when the sloop-of-war Plymouth, on the 30th of September, 1846, fell in with the wreck of the Josephine on the high seas, some five hundred miles from the port of New York, drifting about at the mercy of the waves, entirely abandoned by her crew, derelict and partly plundered, and after considerable exertion by the officers and crew of the Plymouth, the Josephine was taken to New York and libelled for salvage, the claimants of the Josephine admitted the facts set forth in the libel, but insisted that the Plymouth in rendering service to the Josephine was acting under instructions from the government of the United States to render relief freely and promptly to American vessels in distress.

Judge Nelson said: "Ordinary service in rescuing American vessels in distress, requiring no great hardship or peril on the part of the officers or crew, would seem to fall directly within the line of the general duty enjoined by the special instructions of the government on the subject." 3 Blatchf. 328 [U. S. v. Collier, Case No. 14,833]. The same principle of law applies in this case that is applicable in similar cases in daily transactions. A watchman stationed in a dwelling, hotel, bank, factory, or any other place, to guard the building against fire or robbers, and employed for that purpose, could not legally claim extra pay, should it be made to appear that the building would have been burned or robbed if he had not prevented it by his presence and exertion. I stated to the able counsel after hearing the pleadings read, and before any testimony was introduced, that it seemed to me that the only questions were, whether the libellants were firemen, and if so, whether it was their duty as such firemen to extinguish the fire; and I am still of that opinion. Of the facts that one of the libellants was the chief engineer in the fire department, and as such received a salary from the city, and had entire command of the fire brigade, and that the other libellant was foreman of one of the companies; that the engines used in putting out the fire were the property of the city, and were conveyed to this and all other fires at the expense of the city, and supplied by fuel and a competent engineer at the expense of the city, there can be no doubt. While libellants admit this, they insist that there is no law or ordinance of the city requiring of them that they should extinguish this or any other fire, and that all their acts are voluntary, and, though based upon a moral, yet not upon a legal, obligation.

This brings us to the charter of the city and the ordinances of the city council. The portions of the charter to which I refer are as follows:

Art. 2, § 1: That the limits of said city shall embrace so much of the island of Galveston, from the point thereof on the east to Fifty-sixth, or to include the league and labor of land known as the Menard grant; provided that said league and labor shall extend beyond Fifty-Sixth street; thence to include Galveston bay and Pelican island, and one mile north thereof, so as to extend the police authority and jurisdiction, inclusive of Pelican island, over all the area and territory aforesaid.

Art. 3, § 1: The city council shall procure fire engines and other apparatus for the extinguishment of fires, and have control thereof, and provide engine-houses for keeping and preserving the same; and shall have power to organize fire, hook and ladder, hose and axe companies, and a fire brigade; and the companies so organized with such assistant engineers as may be provided for, and the chief engineer, shall constitute the fire department of the city. Each company shall

have the right to elect its own members and officers. The engineer shall be chosen in such manner as said department may determine, subject to the approval of the city council, who shall define the duties of said officers, and pass such ordinances as they may deem proper for the interest and welfare of said department, and to contribute to the efficiency thereof. All officers so elected and approved shall be commissioned by the mayor; and the said companies, officers and members, shall observe and be governed by the ordinances of said city relating to said fire department. Said companies shall have power to adopt their own constitution and by-laws, not inconsistent with the provisions of this act and the ordinances of said city, and said department shall take the care and management of the engines, and other implements and apparatus, provided and used for the extinguishment of fires; and their powers and duties shall be prescribed and defined by the city council.

Art. 5, § 1: Every person actively serving as a fireman, or who shall have so served as a fireman in the city for a continuous term of seven years, shall be exempted from all military duty, excepting in cases of insurrection or invasion. A certificate of the mayor, under the city seal, shall be evidence of such exemption. The engineer and assistant engineers, and members of hook and ladder, hose and axe companies, fire brigade and fire wardens, shall be deemed firemen of this city within the meaning of this section.

The ordinances of the city provide: "An alarm of fire shall be given by ringing two or more strokes per second for the space of a minute or more on the market bell, or any church or hotel bell, in the city of Galveston, or any steamboat bell in the harbor, or the alarm bells in each ward. The fire department of the city of Galveston shall consist of the officers and members of the fire engine and hook and ladder companies now organized in this city, and of such other companies as may be hereafter organized and admitted to the fire department, under the regulations hereinafter provided. The officers of the fire department shall consist of one chief engineer, and first assistant engineer and one third assistant engineer. The number of active members, including officers, belonging to each company, shall not be less than twenty-five men, each of whom shall be duly reported to, and commissioned by the mayor; provided, that each company shall have the right, at any time, as a reward for long service or other merits, to place upon a roll of retired or honorary members any member of said company whose name shall not thereafter be counted on the roll of active members, but who shall be entitled to the benefits of membership, without compulsory service or assessment; and provided, that this section shall not conflict with the number of men allowed by the state legislature to chartered companies. In case of a fire or other

assembling of the department, the chief engineer shall assume control, and be obeyed in all things pertaining thereto. It shall be the duty of the chief engineer, or senior assistant engineer, in command at fires, to establish a post of observation, to be designated in day time by a red flag, and at night by a red lantern, at which post he shall remain during the progress of the fire, and direct the operations of the department, except when his presence at some other portion of the field is temporarily indispensable."

It is not to be questioned that a ship at any of the wharves of Galveston is within the chartered limits of the city. When the charter granted to the city provides that "the city council shall procure fire engines and other apparatus for the extinguishment of fires," it speaks not in a permissive sense, but in an imperative manner. It does not use the word "may," but "shall." When it speaks of the "extinguishment of fires," it refers to those fires that require engines for their extinguishment, and uses the word "fire" with no reference to its locality. The only boundary line to the fire engines is the boundary of the city, and accessibility. When the city accepted the charter, it accepted it with its requirements; and, when the firemen became such, they also accepted the position as firemen set forth in the charter, with such further conditions as the city council might prescribe. When the ordinances provide for the "assembling of the department in case of a fire, and for the chief engineer to assume control," they virtually require such "assembling" in case of a fire. When the alarm bell rings, whether it be the "market bell," any church or hotel bell, or "any steamboat bell in the harbor," the firemen are not permitted either by the charter or ordinances, or their own honest impulses, to inquire what, but where, the fire is. The very instant the alarm is sounded they

"Skelpit on thro' dub an' mire,
Despising wind an' rain an' fire."

No mercenary motive influences them. Like the Howard Association, the Sisters of Charity, and similar societies, guilds and institutions, scattered over this city,—the more the better,—they desire no other temporal reward than the consciousness of doing good. In thus doing, the service performed, in one sense, is voluntary. But it is voluntary performance in the strict line of their duty. When the crew of a government ship saves an American ship in distress, it is not done contrary to the "voluntas" or will of the sailors; but since the act is done in accordance with their legal duty—that duty which is assumed when they enter the United States service—it is not in a technical sense voluntary, but required, service. When the libellants in this case assumed to act as officers in command of the firemen and fire engines of the city, in doing what the charter of the city says shall be done, they are estopped from denying they are such officers in

the line of duty as prescribed by the charter.

There is another view of the case. Among the quotations from the ordinances hereinbefore stated, there is a distinction between honorary members and active members. The honorary members can be members of the company "without compulsory service." This is a virtual declaration that the firemen's service is not voluntary in a legal sense. But I do not base the decision on this ground; but on the broad principle already stated—that the charter of the city requires and commands the city to procure these fire engines and "have the control thereof." The libellants cannot have control of these engines except as officers of the city. As officers of the city, they used these engines to extinguish this fire, and were paid for their services, and not in their individual capacity; and as such officers can they sue, if at all, and not as individuals. From the fact that there has been an unusually large number of disinterested spectators in attendance upon the trial of this case, it is to be inferred that the case is one of unusual interest. It may be proper, therefore, for me to state that, had it appeared to have been a case of salvage, the libellants would have been entitled to a very small compensation. It is not one of those cases where danger stood threatening on all sides, and where peril of both salvors and their ships used in rescuing property from danger was imminent, which is, in most cases of salvage, a basis for reward. In many cases of salvage the same danger threatens the rescuers that visited the rescued. The only way of comparing such cases with the case before the court is by contrasting them, which we can all do in imagination. It is true, that the libellants allege that the night was cold; but the self-registering thermometer that we all have in our gardens, being the most delicate vegetation, tells us that there has not been a cold day this winter. In fact, simply leading the hose from the engines on the wharf to the ship was the principal labor of the firemen. The engines, under the paid superintendence of the paid engineers, did the work.

Before disposing of this case, I think it advisable to state certain principles by which admiralty courts are governed. Judge Hopkinson says: "We must not teach a salvor that he may stand ready to devour what the ocean may spare; he must not be permitted to believe that he brings in a prize of war and not a friend in distress." Decided in 1829 in Hand v. The Elvira [Case No. 6,015]. Treading on the heels of this decision, both as to time and matter, in 1831, in the case of The Nestor [Id. 10,126], Judge Story says: "No system of jurisprudence purporting to be founded upon moral or religious, or even rational principles, could for a moment tolerate the doctrine that a salvor might avail himself of the calamities of others to force upon them a contract unjust, oppressive and exorbitant; that he might turn the price of safety into the price of ruin; that he might turn an act demanded by Christian and public duty into a traffic of profit, which would outrage human feelings and disgrace human justice. 1 Sumn. 210 [The Emulous, Case No. 4,480]." In 1856 the supreme court of the United States, in the case of Post v. Jones [19 How. (60 U. S.) 150], referred to this case of 1 Sumn. 210 [supra], and quoted the same approvingly, and also quoted an English case decided by one of the most celebrated of English judges, laying down as the basis of reward for salvage services: 1st. Danger to property. 2nd. Value. 3rd. Risk of life. 4th. Skill. 5th. Labor. 6th. Duration of service. Tested by these principles, there is little doubt but that a voluntary donation by the underwriters and others interested in the ship and cargo to the firemen, would have far exceeded in value what this court would decree, had the fire been subdued by parties in a private capacity, and owners of the engines used. But as it appears that the fire was extinguished by the machinery belonging to the city, operated by men in the employ of the city, and that they were bound by its charter to do this, the libel is dismissed.